## S97Q1883. BOARDMAN PETROLEUM, INC. v. FEDERATED MUTUAL INSURANCE COMPANY.

### (498 SE2d 492)

THOMPSON, Justice.

This case is before the Court on certification from the United States Court of Appeals for the Eleventh Circuit. *Boardman Petroleum v. Federated Mut. Ins. Co.*, 119 F3d 883 (11th Cir. 1997). The issues involve interpretation of a general liability insurance policy issued to a petroleum distributor.

From 1955 to 1986, Boardman Petroleum, Inc. (Boardman) leased and operated a retail gasoline station in Augusta, Georgia. During that time, Boardman used underground storage tank systems on the property to store and dispense petroleum products. The tanks were removed from the site when the station was closed in 1986, and they did not appear to be compromised at that time.

Between 1977 and 1985, Boardman was insured under general liability policy packages issued for petroleum products distributors by Federated Mutual Insurance Company (Federated). These "Petro-Pac" insurance packages covered the station for property damage and bodily injury to third parties. The policies specifically excluded coverage for underground contamination of property "owned or occupied by or rented to the insured." Boardman elected to purchase first-party coverage from Federated as part of a "Special Multi-Peril" option to the Petro-Pac policy. In addition, Federated sold umbrella policies to Boardman providing excess third-party coverage above the third-party policy limits.

In May 1988, an environmental consultant employed by the owner of the property in connection with a prospective sale, discovered that gasoline had, at some undetermined time, leaked from the underground storage tanks, resulting in petroleum contamination at the site. As required by Georgia law, Boardman informed the Georgia Department of Natural Resources (DNR) of the contamination. The DNR notified Boardman that remedial measures were required to remove the contamination, which was shown to be limited to the service station site. Boardman submitted a corrective action plan which was acceptable to the DNR, and the necessary clean-up was ultimately completed. Boardman also notified Federated, and sought defense and indemnification under the third-party and umbrella policies.[1] Federated denied coverage, and brought the present action in the United States District Court for the Southern District of Georgia seeking a declaration of its duty to defend.[2] During the pendency of

---

[1] Boardman apparently did not seek coverage under the first-party policy which carried a limit of $7,500. The actual cost of the clean-up was significantly greater than that amount.

[2] The history of the litigation is fully set out in both the certified question from the

that lawsuit, the DNR certified that the necessary remedial action had been accomplished, that "no further corrective action is required for free product removal and that no additional groundwater monitoring is necessary for the subject site, at this time."[3]

Cross-motions for summary judgment were filed. Federated argued in part that the owned or rented exclusion precluded coverage because the contamination was limited to the soil and groundwater at the site of the station. The district court, however, adopted Boardman's position and entered judgment in its favor, concluding (1) that clean-up costs solely for contamination on the insured's leased premises are covered, despite the exclusion for damage to property "owned, occupied or rented" by the policyholder; and (2) that an "exposure" trigger of coverage applied to the policies under Georgia law (i.e., coverage is triggered when property damage occurs within the policy period, even if not discovered within the policy period), as opposed to a "manifestation" trigger of coverage (i.e., coverage is triggered only when the property damage occurs and is discovered within the policy period). Federated appealed to the Eleventh Circuit.

The Eleventh Circuit determined that resolution of the case involves unsettled questions of Georgia law regarding contract interpretation. It certified the following questions:

1. What is the appropriate trigger of coverage under general liability policies such as the ones at issue in this case?

2. Does an "owned or rented" coverage exclusion in general liability policies such as the ones at issue bar coverage of all or a portion of an insured's claims for indemnification for the cost of a state-ordered contamination clean-up when that clean-up involves soil and groundwater contamination which has not yet damaged surrounding soil and/or groundwater?

Because we find that the owned or rented exclusion is dispositive, we do not reach the trigger of coverage inquiry.

Under Georgia law, contracts of insurance are interpreted by ordinary rules of contract construction. *Park 'N Go v. U. S. Fidelity &c. Co.*, 266 Ga. 787, 791 (471 SE2d 500) (1996). "Three well known

---

Eleventh Circuit, *Boardman Petroleum v. Federated Mut. Ins. Co.*, supra, and in the order of the district court, *Boardman Petroleum v. Federated Mut. Ins. Co.*, 926 FSupp. 1566 (S. D. Ga. 1995).

[3] The "no further corrective action" letter went on to state that the site *could* be subject to further corrective action if certain future events (not then present) were to occur.

rules . . . apply. Any ambiguities in the contract are strictly construed against the insurer as drafter of the document; any exclusion from coverage sought to be invoked by the insurer is likewise strictly construed; and insurance contracts are to be read in accordance with the reasonable expectations of the insured where possible." (Citations omitted.) *Richards v. Hanover Ins. Co.*, 250 Ga. 613, 615 (1) (299 SE2d 561) (1983). Where the terms are clear and unambiguous, and capable of only one reasonable interpretation, the court is to look to the contract alone to ascertain the parties' intent. *Park 'N Go*, supra at 791. The contract is to be considered as a whole and each provision is to be given effect and interpreted so as to harmonize with the others. *McCann v. Glynn Lumber Co.*, 199 Ga. 669 (34 SE2d 839) (1945).

The owned or rented property exclusion in issue provides:

> This insurance does not apply . . . to property damage to (1) property owned or occupied by or rented to the insured, (2) property used by the insured, or (3) property in the care, custody or control of the insured or as to which the insured is for any purpose exercising physical control.

Terms in an insurance policy are given their ordinary and common meaning, unless otherwise defined in the contract. *Claussen v. Aetna Cas. &c. Co.*, 259 Ga. 333 (1) (380 SE2d 686) (1989). The owned or rented exclusion clearly and unequivocally precludes coverage for the costs of remediating contamination that is limited exclusively to the policyholder's property. As Boardman was the lessee of the affected property, the first-party exclusion precludes coverage for its claim for damage limited to the site.

In recognition of that exclusion, Boardman opted to purchase Federated's first-party property insurance to cover:

> [T]he insured's interest in all real and personal property, both above and below ground (except as otherwise excluded) including underground tanks, contents of tanks, piping and connections, petroleum products and other products and merchandise usual or incidental to the insured's business of an oil distributing station.

This policy specifically covers pollution clean-up expenses, as follows:

> The insured may apply the amount stated under the limit of liability for this section to cover pollution clean-up expenses resulting from a direct loss in any one occurrence at a designated location on this form. This will include expenses for testing and clean-up work where required by the govern-

mental pollution control authorities. Coverage does not apply to fines and penalties imposed on the insured as a result of a pollution occurrence nor to any expenses for clean-up of the designated premises.

By its express terms, this optional first-party insurance provides coverage for government mandated pollution clean-up expenses *on the insured's own property*. As such, it covers expenses which are specifically excluded in the third-party policy. The unambiguous language of both the first and third-party provisions must be given effect and harmonized with one another. *McCann*, supra. If the exclusion is not applied to property rented by Boardman, the exclusion is rendered totally meaningless and would eliminate the need for first-party coverage altogether. And, by purchasing the optional first-party insurance, Boardman's expectations were such that the third-party policy would not cover pollution clean-up costs to its own property. Otherwise, why would the policyholder elect to pay a premium for unnecessary and redundant coverage?[4]

In concluding that coverage is not barred by the owned or rented exclusion, the district court relied solely on *Claussen v. Aetna Cas. &c. Co.*, 754 FSupp. 1576 (S. D. Ga. 1990), a case interpreting a similar policy exclusion under Florida law. But *Claussen* is distinguishable for several reasons. First, because a Florida property owner does not own the groundwater beneath the property, the *Claussen* court determined that contamination below ground extends to property not owned by the insured; thus, the owned property exclusion does not bar coverage. Id. at 1580. In contrast, Georgia law provides that a property owner owns everything that is above and below his real estate. OCGA §§ 44-1-2; 51-9-9. Applying similar principles of private ownership of groundwater led a Texas federal court to hold that an identical exclusion barred third-party coverage for groundwater contamination under the policyholder's site. *American States Ins. Co. v. Hanson Indus.*, 873 FSupp. 17, 24 (S. D. Tex. 1995). The same law is applicable here — contamination of on-site groundwater alone is damage to the insured's own property.

An equally critical distinction in *Claussen* was evidence that "hazardous substances polluted not only the ground water under Claussen's land, but also water and land surrounding Claussen's property." Id. And at the very least, the court determined that there was an *imminent threat* of off-site contamination. Id. The evidence in the present case established neither contamination of off-site property nor imminent threat of such contamination.

---

[4] For an explanation of the two coverages, see Ostranger & Newman, Handbook on Insurance Coverage Disputes, § 10.03 (b) at 522-528 (9th ed. 1998).

Boardman argues that it is not attempting to collect for damage to its own property, but is merely seeking indemnification for liability it incurred as a result of the DNR-ordered clean-up to prevent the spread of contamination. We find that argument unavailing. The evidence failed to establish an imminent threat of harm to third-party property. Nor does the definition of property damage in the policies encompass threatened future harm. Thus, where there is no evidence of a reasonable present threat of harm to third-party property, coverage is barred. Any other construction is contrary to the policy language and would render the owned or rented exclusion meaningless because in almost every case the policyholder could simply contend that contamination on its own property presents a threat of future harm to off-site property. Moreover, the plain language of the first-party policy specifically encompasses the situation presented here: "clean-up work where required by the governmental pollution control authorities." Thus, Boardman cannot obtain coverage for the costs of remediation to its own property on grounds that the clean-up was state-ordered or because of a possible future threat to surrounding property.

Our ruling is consistent with the many jurisdictions which have applied similar "owned or rented" property exclusions to bar coverage for remedial measures on an insured's own property. See, e.g., *Figgie Intl. v. Bailey*, 25 F3d 1267 (5th Cir. 1994) (coverage denied where plaintiff failed to show either actual or threatened third-party property damage); *Hakim v. Mass. Insurer's Insolvency Fund*, 675 NE2d 1161 (Mass. 1997) (costs incurred for the sole purpose of remediating insured's own property is barred by an owned property exclusion); *Cedar Lane Invs. v. St. Paul Fire &c. Ins. Co.*, 883 P2d 600, 603 (Colo. Ct. App. 1994) (owned property exclusion "unambiguously" barred coverage for an EPA-ordered clean-up of the insured's property); *State v. Signo Trading Intl.*, 612 A2d 932 (N. J. 1992) (owned property exclusion bars coverage for state ordered clean-up to insured's own property). See also *Bausch & Lomb v. Utica Mut. Ins. Co.*, 625 A2d 1021, 1033-1036 (Md. 1993); *W. M. Schlosser Co. v. Ins. Co. of N. America*, 600 A2d 836, 841 (Md. 1992); *Martin v. State Farm Fire &c. Co.*, 932 P2d 1207 (Ore. App. 1997); *E. I. du Pont de Nemours & Co. v. Allstate Ins. Co.*, 686 A2d 152 (Del. 1996); *American States Ins. Co.*, supra.[5]

The dissent relies on the reasoning in *Anderson Development Co. v. Travelers Indem. Co.*, 49 F3d 1128 (6th Cir. 1995), and *Patz v. St.*

---

[5] For additional survey on how courts have approached the owned property exclusion provision in mandated clean-ups, see Kirby T. Griffs, Apportionment of Environmental Cleanup Costs Under the Owned-Property Exclusion in CGL Insurance Policies, 80 Va. L. Rev., No. 6, p. 1351.

*Paul Fire &c. Ins. Co.*, 15 F3d 699 (7th Cir. 1994), for the proposition that recovery should be available under the third-party policies for the cost of complying with the government ordered clean-up. *Anderson* contains a critical factor, not present here — the government agency recognized that "[a]ctual or threatened releases of hazardous substances from [the] site . . . may present an imminent and substantial endangerment" to the public, and that insured's site "posed at least a significantly probable threat to the environment." Id. at 1134.[6] Thus, *Anderson* did not decide the question before this Court, whether the insurer must pay for the clean-up where there has been neither damage to non-owned property nor any threat of such damage.

The Seventh Circuit's decision in *Patz* has been widely criticized for its failure to analyze (or even acknowledge) the unambiguous language of the policies in issue. See *E. I. du Pont de Nemours & Co.*, supra at 157 (*Patz* "ignores the clear and unambiguous language of the policies . . . as well as the well-reasoned and predictable law . . . regarding the construction of insurance policies"); *Martin*, supra at 1212 (refusing to apply *Patz* because "the analysis of insurance coverage issues is based on the specific terms of the policies, not on the courts' general concepts of what coverage various kinds of insurance should provide"); *Hakim*, supra at 1166, n. 11 (*Patz* is unpersuasive because it is inconsistent with the well-established rule of reading the policy as a whole "without according undue emphasis to any particular part over another").

In accordance with the reasoning of the many jurisdictions which have considered this issue, we hold that the plain language of the owned or rented property exclusion bars coverage for indemnification for the cost of a state-ordered contamination clean-up when that clean-up involves soil and groundwater contamination to property owned or rented by the insured, and does not involve property of a third party, and poses no immediate or imminent threat of off-site contamination.

*Question answered. All the Justices concur, except Carley, J., who dissents.*

---

[6] Generally, courts have been willing to extend liability to the insurer where *both* owned and non-owned property have been damaged. See, e.g., *South Carolina Ins. Co. v. Coody*, 813 FSupp. 1570, 1578-1579 (M.D. Ga. 1993); *Unigard Mut. Ins. Co. v. McCarty's, Inc.*, 756 FSupp. 1366, 1369 (D. Idaho 1988). But see *Lido Co. v. Fireman's Fund Ins. Co.*, 574 A2d 299 (Me. 1990) (remediation of on-site damage to non-owned property is not covered under general liability policy). And some courts have held that *demonstrated* danger to third parties amounts to damage which is outside the limitations of the owned-property exclusion. See, e.g., *Bankers Trust Co. v. Hartford Accident &c. Co.*, 518 FSupp. 371, 374 (S.D.N.Y. 1981).

CARLEY, Justice, dissenting.

The majority opinion is based upon the erroneous premise that the liability policies issued to Boardman "specifically excluded coverage for underground contamination of property 'owned or occupied by or rented to the insured.'" There is only a general exclusion in the liability policies for "damages" to Boardman's "owned or rented property." The question presented for resolution is whether this general exclusion should be construed as a specific exclusion of coverage for Boardman's liability for underground contamination of its own property. I cannot agree with the majority that this general exclusion for "damages" bars the indemnification of the insured for the cost of a state-ordered contamination clean-up merely because the neighboring soil or groundwater has yet to be contaminated or imminently threatened. In my opinion, this court should answer the Eleventh Circuit's second question in the negative and should, therefore, consider the very important first question as well.

1. Although Georgia appellate courts have not addressed the precise question of the scope of the "owned or rented property" exclusion in a liability policy, considerable groundwork in resolving that question has been laid. The majority concedes that any exclusion from coverage is strictly construed against the insurer as the drafter of the policy and that, where possible, insurance contracts should be read in accordance with the reasonable expectations of the insured. "Thus, if an insurance contract is capable of being construed two ways, it will be construed against the insurance company and in favor of the insured. [Cits.]" *Claussen v. Aetna Cas. &c. Co.*, 259 Ga. 333, 334-335 (1) (380 SE2d 686) (1989). "Under Georgia law, the risk of any lack of clarity or ambiguity in an insurance contract must be borne by the insurer. [Cit.]" *Claussen v. Aetna Cas. &c. Co.*, supra at 337 (3). Our Court of Appeals has observed that the *Claussen* court held that, without "a clear and unambiguous pollution exclusion clause, the EPA-mandated costs incurred by the owner of polluted property *are* within the coverage of a comprehensive general liability policy." (Emphasis in original.) *Atlantic Wood Indus. v. Lumbermen's Underwriting Alliance*, 196 Ga. App. 503, 505-506 (2) (396 SE2d 541) (1990). In *Atlantic Wood Indus.*, the Court of Appeals, applying the principles set forth in *Claussen*, held that EPA-mandated clean-up costs constitute "damages" within the coverage of the affected insured's liability policy.

> A layman, having insured himself against liability for "damages," without further definition or limitation, would reasonably conclude that he is protected from financial loss without regard to the legal basis upon which his liability for his loss might technically be premised.

*Atlantic Wood Indus. v. Lumbermen's Underwriting Alliance*, supra at 506 (2). This rejection of a narrow construction of the type of costs covered as "damages" under a liability policy is consistent with the majority rule that the "owned or rented property" exclusion in a liability policy does not exclude coverage for the costs of cleaning up soil and groundwater contamination. *Alabama Plating Co. v. U. S. Fidelity &c. Co.*, 690 S2d 331, 337 (I) (B) (Ala. 1996). A person who obtains insurance covering his *liability* for "damages," would reasonably conclude that an exclusion for damage to *his* "owned or rented property" does not exclude indemnification for his *liability* for the expense of a state-ordered clean-up, regardless of whether the extent of that clean-up is limited to his own property.

There is no specific pollution exclusion clause in the liability policies issued to Boardman and, unlike the majority, I do not believe that the existence or wording of the first-party property insurance policy is dispositive. Boardman is not seeking to recover under that policy for any damage to *its* property but, rather, is seeking to recover under the third-party policies for the cost of *liability* imposed upon it by the Department of Natural Resources (DNR). *Anderson Development Co. v. Travelers Indem. Co.*, 49 F3d 1128, 1134 (II) (C) (6th Cir. 1995); *Patz v. St. Paul Fire &c. Ins. Co.*, 15 F3d 699, 705 (7th Cir. 1994). I believe that the reasoning of the Seventh Circuit Court of Appeals is applicable here:

> [The insureds] are not attempting to obtain an insurance award for a reduction in the value of, or other damage to, their land. . . . It is a policy of liability insurance, not casualty insurance, on which they have sued. They seek to recover the cost of complying with a government order to clean up a nuisance. The fact that the clean up occurred on their land is irrelevant. For all we know, the damage to the land was much less than the cost of cleaning it up.

*Patz v. St. Paul Fire &c. Ins. Co.*, supra at 705.

Federated does not and could not argue that the third-party policies insured only against liability to pay damages awarded in a lawsuit against Boardman. *Atlantic Wood Indus. v. Lumbermen's Underwriting Alliance*, supra at 504 (2). Of course, "the mere desire of an insured to *voluntarily* reduce potential future liability could very well be barred by the owned property exclusion." (Emphasis in original.) *Anderson Development Co. v. Travelers Indem. Co.*, supra at 1134 (II) (C). Here, however, while Boardman did cooperate voluntarily, "it was under a government mandate to conduct the environmental clean-up." *Anderson Development Co. v. Travelers Indem. Co.*, supra at 1134 (II) (C). Boardman's decision to cooperate, rather than to

force the DNR to "bring a coercive suit, does not change the bottom line that a legal obligation exists." *Anderson Development Co. v. Travelers Indem. Co.*, supra at 1133 (II) (B). Thus, consistent with *Claussen v. Aetna Cas. &c. Co.*, supra, and *Atlantic Wood Indus. v. Lumbermen's Underwriting Alliance*, supra, "there was indeed liability to a third party," that being the DNR. *Anderson Development Co. v. Travelers Indem. Co.*, supra at 1134 (II) (C). Accordingly, it is irrelevant whether Boardman owns the groundwater beneath its property or whether there was an imminent threat of off-site contamination. *Patz v. St. Paul Fire &c. Ins. Co.*, supra at 705.

As the majority opinion indicates, some courts have construed the general "owned or rented property" exclusion in a liability policy broadly in favor of the insurer, so as to exclude coverage for the costs of cleaning up soil and groundwater contamination. However, that construction of the exclusion is the minority rule. The majority of jurisdictions which have addressed the issue construe the general "owned or rented property" exclusion narrowly in favor of the insured, so as not to exclude coverage for the clean-up costs. See *Alabama Plating Co. v. U. S. Fidelity &c. Co.*, supra at 337 (I) (B), fn. 11. Moreover, a narrow construction of the general exclusion is entirely consistent with, if not compelled by, *Atlantic Wood Indus. v. Lumbermen's Underwriting Alliance*, supra. *Atlantic Wood Indus.* is a Georgia decision which the majority neither distinguishes nor expressly overrules, even though that case indicates that a clear and unambiguous pollution exclusion, rather than a mere general exclusion, would be necessary to exclude liability coverage for government-mandated pollution clean-up costs. Thus, by giving the general "owned or rented property" exclusion a broad construction, the majority opinion places this state in the minority camp, notwithstanding Georgia authority which supports adoption of the majority rule whereby that general exclusion is construed narrowly in favor of the insured. Because I believe that the majority rule is better-reasoned and is supported by persuasive Georgia authority, I submit that the "owned or rented property" exclusion does not bar indemnification of Boardman for the state-ordered contamination clean-up.

2. The first certified question relates to the appropriate "trigger of coverage" under general liability policies such as those issued to Boardman. Federated contends that a "manifestation" trigger of coverage is appropriate, whereby "coverage is triggered only when property damage occurs *and* is *discovered* within the policy period." (Emphasis in original.) *Boardman Petroleum v. Federated Mut. Ins. Co.*, 119 F3d 883, 885 (11th Cir. 1997). In my opinion, "such a theory is incompatible with the language" of the policies at issue here. *Trizec Properties v. Biltmore Constr. Co.*, 767 F2d 810, 813, fn. 6 (11th Cir. 1985). The policies issued by Federated provide that the "potential

for coverage is triggered when an 'occurrence' results in 'property damage.'" *Trizec Properties v. Biltmore Constr. Co.*, supra at 813.

> Nothing in the language of the policies requires that the claimed property damage be discovered or manifested during the policy period. . . . Indeed, the very nature of an "occurrence" as opposed to a "claims-made" policy is to provide coverage for property damage that occurred during the policy period whenever that liability is imposed. [Cit.]

*Tufts University v. Commercial Ins. Co.*, 616 NE2d 68, 74 (3) (Mass. 1993). See also *Sentinel Ins. Co. v. First Ins. Co.*, 875 P2d 894, 916 (c) (Hawaii 1994); *Trizec Properties v. Biltmore Constr. Co.*, supra at 813; *American Employer's Ins. Co. v. Pinkard Constr. Co.*, 806 P2d 954, 955 (Colo. App. 1990). That the insurance industry itself understands the language employed in these policies as establishing a "non-manifestation" trigger is confirmed by its introduction of "claims made" policies into the area of comprehensive liability insurance. *Montrose Chem. Corp. v. Admiral Ins. Co.*, 913 P2d 878, 903 (II) (5) (Cal. 1995). "That understanding is clearly reflected in the higher premiums that must be paid for occurrence-based coverage to offset the increased exposure. ([Cit.])" *Montrose Chem. Corp. v. Admiral Ins. Co.*, supra at 903 (II) (5).

Federated argues that a "manifestation" trigger of coverage is necessary to avoid "a factual and scientific morass as parties litigate to determine when exposure actually happened." *Boardman Petroleum v. Federated Mut. Ins. Co.*, supra at 886. However, all that is necessary to establish satisfaction of a "non-manifestation" trigger is evidence that the property damage more likely than not occurred during a period of coverage, which is an eight-year period here and usually is at least a one-year period. See *Sentinel Ins. Co. v. First Ins. Co.*, supra at 917 (C). "Nevertheless, however potentially difficult the fact-finding task may be, we cannot rewrite the plain terms of the policy. [Cit.]" *Sentinel Ins. Co. v. First Ins. Co.*, supra at 917 (C). To apply a "manifestation" trigger of coverage to the occurrence-based liability policies issued by Federated would be to rewrite them, transforming the broader and more expensive occurrence-based policies into "claims made" policies. *Montrose Chem. Corp. v. Admiral Ins. Co.*, supra at 904 (II) (5).

Several triggers of coverage other than the "manifestation" trigger have been identified. Annot., 14 ALR5th 695. However, resolution of the first certified question is dependent only upon the conclusion that the "manifestation" trigger is inappropriate. *Ray Indus. v. Liberty Mut. Ins. Co.*, 974 F2d 754, 765 (III) (6th Cir. 1992). This is true because Boardman would be covered under any of the other

"non-manifestation" trigger theories. *Tufts University v. Commercial Union Ins. Co.*, supra at 75 (3). The only dates which can trigger occurrence-based coverage are those of exposure to injury-causing conditions or those of actual injury. See *South Carolina Ins. Co. v. Coody*, 813 FSupp. 1570, 1576 (I) (B) (1) (a) (M.D. Ga. 1993). If an insured can show that both of these dates occurred within the policy period, then coverage is triggered under every "non-manifestation" theory. See *South Carolina Ins. Co. v. Coody*, supra at 1576 (I) (B) (1) (a). The majority rule in cases involving environmental damage is that the actual injury, which in this case is the contamination of the soil and groundwater, occurred at the same time that the soil and groundwater were exposed to the petroleum leaks. *Ray Indus. v. Liberty Mut. Ins. Co.*, supra at 766 (III); *South Carolina Ins. Co. v. Coody*, supra at 1575-1576 (I) (B). Since the exposure was simultaneous with the actual injury, it follows that Boardman is covered under any "non-manifestation" trigger of coverage. Thus, I believe that this Court should answer the Eleventh Circuit's first question by holding that the "manifestation" trigger of coverage is not appropriate under general liability policies such as the ones at issue in this case. Because the majority incorrectly answers one certified question and refuses to answer the other, I respectfully dissent.

DECIDED FEBRUARY 23, 1998 —
RECONSIDERATION DENIED APRIL 2, 1998.

*Kilpatrick Stockton, Raymond G. Chadwick, Jr., Robert P. Sentell III,* for appellant.

*Allgood, Childs, Mehrhof & Williams, Richard R. Mehrhof, Jr.,* for appellee.

*Weissman, Nowack, Curry & Wilco, Linda B. Foster,* amicus curiae.